UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

ESSEX INSURANCE COMPANY,

                                   Case No. 2:07-cv-00984

         Plaintiff,

                                   Judge Bruce S. Jenkins

   vs.

EDIZON, et al.,

         Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

HEARING

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT:          United States District Court
                      350 South Main Street, Room 420
                      Salt Lake City, Utah

DATE:             Thursday, June 3, 2010

TIME:             1:35 p.m.

REPORTED BY:     Scott M. Knight, RPR

```
1                        APPEARANCES

2

3    FOR PLAINTIFF:

4    GARY L. JOHNSON, ESQ.,

5    RICHARDS, BRANDT, MILLER & NELSON

6         299 South Main Street

7         Suite 1500

8         Salt Lake City, Utah 84111

9

10   FOR DEFENDANT:

11   CALEB J. FRISCHKNECHT, ESQ.,

12   MARK M. BETTILYON, ESQ.,

13   RAY, QUINNEY & NEBEKER

14        36 South State Street

15        Suite 1400

16        Salt Lake City, Utah 84145

17

18

19

20

21

22

23

24

25
```

1                    Hearing

2              June 3, 2010

3              PROCEEDINGS

4              THE COURT:  Why don't we look at Essex

5    Insurance Company vs. Edizon, and Others.  It's

6    07-cv-984.  Here today on a motion to amend answer

7    and counterclaim.  Those who are making

8    appearances, if you'll make a record for us, tell

9    us who you are and whom you represent.

10             MR. JOHNSON:  Gary Johnson for

11   plaintiff, Essex Insurance Company, your Honor.

12             MR. BETTILYON:  And Mark Bettilyon and

13   Caleb Frischknecht on behalf of ACTI, your Honor.

14             THE COURT:  You go ahead.

15             MR. BETTILYON:  Mr. Frischknecht is

16   going to make the argument.

17             MR. FRISCHKNECHT:  Good afternoon, your

18   Honor.  As you will recall, this is an insurance

19   declaratory judgment action brought by Essex

20   Insurance Company against its insured Edizon, LC,

21   and the third-party claimant Advanced Comfort

22   Technology Inc., or ACTI.

23             As your Honor indicated, we're here on

24   ACTI's motion for leave to file its amended answer

25   and counterclaim which is best informed by a bit of

1    history with respect to this case and the

2    underlying case.  ACTI brought 15 different causes

3    of action against Edizon, the insured, in the

4    underlying state court case, several of which, ACTI

5    asserts, triggered Essex's duty to defend and

6    indemnify with respect to the policies it issued to

7    Edizon, LC.

8            Now, the underlying policies have three

9    different types of insurance coverage, which are

10   not mutually exclusive; they're independent:

11   Coverage A, which is for bodily injury and property

12   damage; Coverage B, which is for personal and

13   advertising injury; and Coverage C, which is for

14   medical payments. And neither the insured, Edizon,

15   or ACTI has asserted coverage under Coverage C,

16   which is not at issue. However, both Coverage A, or

17   bodily injury and property damage, and Coverage B

18   for personal and advertising injury have been at

19   issue from the outset of this case.

20           The issues with respect to Coverage A

21   for bodily injury and property damage were disposed

22   of by this Court in its summary judgment ruling in

23   March 2009.  We're not here with respect to those

24   issues. However, the Court's March 2009 issue

25   ruling did not deal with the issues surrounding

1    ACTI's arguments that there was in fact coverage

2    under the provisions of Coverage B for personal and

3    advertising issue--injury.

4              Shortly after the Court's March 2009

5    order, ACTI submitted a motion for clarification

6    requesting a ruling with respect to Essex's duty to

7    defend and duty to indemnify on that point.

8              As you will recall it, your Honor, at

9    that time, Essex had expressed some concerns to the

10   Court regarding ACTI's standing to pursue coverage

11   affirmatively rather than to simply defend against

12   Essex's claim for declaratory judgment.  At that

13   time the parties submitted some supplemental

14   briefing indicating ACTI's position that it has

15   been, and remains, entitled to a ruling from the

16   Court on that issue, which was the subject of

17   Essex's declaratory judgment complaint.  We're now

18   here on the motion for leave to amend, which has

19   been prompted by ACTI's acquisition, by virtue of a

20   settlement, of Edizon's rights and claims under the

21   policies.

22              ACTI gave a substantial amount of

23   consideration in those settlement discussions to

24   acquire those claims, which now eliminates any

25   lingering concerns with respect to ACTI's standing

1    to affirmatively pursue coverage both with respect

2    to the duty to defend and the duty to indemnify.

3            The duty to defend in this case, just

4    to give your Honor some indication of what it might

5    be worth to ACTI, it's ACTI's understanding that

6    Essex incurred somewhere in the range of $800,000

7    in attorneys' fees to defend the underlying case,

8    which ACTI believes were attorneys' fees that

9    should have been paid by Essex as a result of its

10   duty to defend under the policies.

11           ACTI's position further is that

12   approximately $650,000 in damages awarded by the

13   jury in the underlying case with respect to ACTI's

14   tortious interference claims are also covered under

15   Essex's duty to indemnify under Coverage B for

16   personal and advertising injury.  Accordingly, ACTI

17   is very interested in obtaining a ruling on that

18   issue.

19           In an effort to clarify the record and

20   to tee this issue up before your Honor for a

21   decision that the parties can go their mutual ways

22   on, ACTI has filed this motion for leave to amend,

23   which just simply asserts counterclaims.  It

24   doesn't change ACTI's answer--substantive answer

25   with respect to Essex's affirmative claims--which,

1    again, your Honor, one of those was for a

2    declaratory judgment with respect to the coverage

3    issues under a personal and advertising injury

4    coverage.  ACTI merely asserts a claim for breach

5    of contract related to the duty to defend and the

6    duty to indemnify, which claim it has acquired from

7    Edizon, and claims for declaratory judgment on

8    those same issues.

9              But essentially, your Honor, those

10   issues are issues that have been before this Court

11   from the outset of this case, and which ACTI simply

12   seeks a decision on.  And it believes that the

13   clean and most efficient way to put this before the

14   Court is to allow for an amended complaint--

15             THE COURT:  If they've been here from

16   the beginning, why that?

17             MR. FRISCHKNECHT:  Your Honor, it's

18   simply for purposes for assuring there is a clean

19   record.  It is ACTI's position that from the

20   beginning of this case, as a named defendant--who,

21   I might add, would have been a Rule 19 necessary

22   party, in any event, in this case--that it had

23   standing to assert arguments with respect to the

24   issues of coverage both with respect to Coverage A

25   for personal and--personal injury and bodily injury

1   and property damage and for Coverage B, for

2   personal and advertising injury coverage.

3           The amendment simply allows this Court

4   to rule with respect to the claims that are

5   asserted in both ACTI's pleading as well as Essex's

6   pleading.  But in substance, your Honor, ACTI's

7   position has always been that when Essex sought a

8   declaratory judgment against ACTI with respect to

9   the issue of availability of coverage under

10  Coverage B, part B, for personal and advertising

11  injury that ACTI had--that ACTI had standing to

12  assert that coverage, and--and should the Court

13  rule on those claims, that it would in fact entitle

14  ACTI, now that it owns those claims, to any

15  damages--

16          THE COURT:  Now, it was buying those

17  claims?

18          MR. FRISCHKNECHT:  --that would be paid

19  out.

20          THE COURT:  Is that what you're saying?

21          MR. FRISCHKNECHT:  Yes, your Honor, as

22  part of settlement.  ACTI obtained a judgment

23  against Edizon, LC, as part of the underlying state

24  court action.  And during its efforts to execute on

25  that judgment, formal negotiations ensued with

1    Edizon, LC, and ultimately a settlement was arrived

2    by which ACTI accepted cash consideration, among

3    other things, including the claims that Edizon had

4    under the policy against Essex.

5             Now, the other reason for the amended

6    complaint, your Honor, is just to make the record

7    clear that ACTI in fact owns those claims, that

8    ACTI could not have asserted the breach of contract

9    claim before because it was not the contracting

10   party but it is now able to assert the contract

11   claim for breach of the duty to defend, breach of

12   the duty to indemnify because it has acquired that

13   claim by virtue of an assignment by the insured.

14            THE COURT:  Tell me exactly, how are

15   you suggesting the pleadings be amended?

16            MR. FRISCHKNECHT:  ACTI has submitted

17   the proposed amended answer and counterclaim.  And

18   the answer portion of the pleading has not changed.

19   It remains the same as the answer that ACTI filed

20   in this case initially.  The only change to the

21   amended answer and counterclaim is the addition of

22   the three counterclaims, the assertion of the

23   breach--

24            THE COURT:  They bought?

25            MR. FRISCHKNECHT:  Yes, your Honor.

1          THE COURT:  So you're saying since we

2    were initially here, we acquired some claims?

3          MR. FRISCHKNECHT:  That's right, your

4    Honor.

5          THE COURT:  Those are claims that you

6    didn't have before?

7          MR. FRISCHKNECHT:  The breach of

8    contract claim ACTI did not have before because it

9    wasn't a contracting party.  However, it's ACTI's

10   position that by virtue of Edizon's pleading--or

11   excuse me--Essex's pleading and declaratory

12   judgment action against ACTI with respect to

13   coverage under Coverage B of the policy, that that

14   issue has always been before this Court.  And that

15   goes, your Honor, to the issue of prejudice.  Under

16   the 10th Circuit case law, the primary

17   consideration with respect to a motion for leave to

18   amend is whether the nonmoving party will

19   experience prejudice as a result.

20         THE COURT:  Well, if you're bringing a

21   new claim, why isn't that prejudicial?

22         MR. FRISCHKNECHT:  The claim itself is

23   not new.  The issues underlying the claim have been

24   here in this case from the beginning.

25         THE COURT:  I thought you just told me

1     you bought three claims.

2              MR. FRISCHKNECHT:  But--but your Honor

3     is correct that--that--that ACTI did not own a

4     breach of contract claim prior to this point.

5              THE COURT:  So that's new?

6              MR. FRISCHKNECHT:  It is new in that

7     ACTI is asserting it rather than Edizon.  But those

8     claims have been a part of this case from the

9     beginning.  The issue here is, is there coverage or

10    is there not coverage.  And that has been at issue

11    from the very beginning of this case.  And ACTI now

12    is seeking to clarify the record by filing this

13    amended answer and counterclaim so that the record

14    is clear that ACTI is now the beneficial owner.

15             THE COURT:  You're either adding a claim

16    or you're not.  If you're adding a claim, then you

17    ought to be direct and say we're adding a claim.

18             MR. FRISCHKNECHT:  That's right, your

19    Honor. We are adding a claim.

20             THE COURT:  So that's new?

21             MR. FRISCHKNECHT:  Yes.  Yes.  Our--

22    ACTI's claim for breach of contract is a claim that

23    wasn't previously part of this case because ACTI

24    did not own it.  However, the issues underlying

25    that claim have been a part of this case from the

1    beginning.  And the 10th Circuit's consideration

2    with respect to whether or not the nonmoving party

3    will experience prejudice is based on its ability

4    to prepare its defense.

5             Now, Essex defends with respect to the

6    claims and issues concerning personal and

7    advertising injury has been fully developed in this

8    case, as illustrated first by the fact that they

9    asserted it affirmatively in their complaint in

10   this action; and second, it was fully briefed by

11   Essex in the summary judgment motions that occurred

12   in late 2008.  The issues haven't changed; simply

13   the owner of the claim has, thereby eliminating any

14   concerns with respect to ACTI's standing in this

15   case and allowing the Court to move forward and

16   provide a substantive ruling on those issues.

17            ACTI would propose, your Honor, that

18   upon amending the complaint and allowing for Essex

19   to reply to ACTI's counterclaims, that these issues

20   could be teed up for summary judgment for the

21   Court's decision, particularly with respect to the

22   duty to defend, which--which is a substantive claim

23   that can be decided quite quickly.

24            THE COURT:  Okay.

25            MR. FRISCHKNECHT:  Thank you, your

1    Honor.

2              MR. JOHNSON:  May it please the Court,

3    counsel.

4              I am--I don't really have much to say,

5    your Honor.  Essex filed its complaint over two and

6    a half years ago.  The issues that--if I understand

7    ACTI's arguments, the issues they want to bring up

8    in their counterclaim are already before the Court,

9    and I don't--finality, in and of itself, is a

10   valuable end that should be pursued, especially in

11   litigation.

12             Before the Court are pending the motion

13   for clarification on the form of the judgment,

14   whether it's going to--you know, the issues

15   relating to Coverage B have been fully briefed and

16   argued, and they were argued eloquently by counsel

17   for ACTI at the original motion for summary

18   judgment over a year ago.

19             I--I don't see the purpose or the merit

20   in the Court granting the motion to amend their

21   answer and allowing them leave at this point in

22   time, post-issuance of a judgment, to file the

23   counterclaim that I'm just going to take the very

24   same arguments they offered earlier and file a

25   memorandum--a motion to dismiss on mootness

1   grounds.  It mirrors--their claims mirror the

2   claims that are already before the Court in the

3   complaint for declaratory relief.  It's pointless

4   and just a waste of the Court's resources and the

5   parties' resources.

6            THE COURT:  What do you want me to do?

7            MR. JOHNSON:  I think the Court should

8   address their motion for clarification of the

9   judgment.  And the Court should extend the judgment

10  to include the Coverage B issue and should grant

11  Essex's motion for summary judgment.  That's what I

12  want you to do.

13           THE COURT:  Why should I do that?

14           MR. JOHNSON:  Because the facts,

15  particularly the additional supplemental pleadings

16  provided by ACTI to this Court that included the

17  jury verdict form and the Court's findings of fact

18  and conclusions of law from the underlying action,

19  establish unequivocally that all of the claims that

20  ACTI prevailed on against Edizon in the underlying

21  trial arose out of Edizon's breaching of the

22  licensing agreement and the settlement agreement--

23  and not just breaching them expressly, but Edizon's

24  breach of the implied covenants of good faith and

25  fair dealing of each of those contracts.

1           Judge Skanchy goes to great lengths in

2    his findings and conclusions to root the jury's

3    verdict and the awards of money against Edizon in

4    Edizon's breach of those two contracts.  There is

5    no coverage whatsoever under the Essex policy for

6    any claim that arises out of a breach of contract.

7           And under Utah law, the phrase "arising

8    out of," as determined by Utah Supreme Court and

9    the subsequent courts of appeals' decisions, give a

10   very broad, expansive reading of that phrase.  They

11   say that that is a phrase that applies to

12   originating from, related to, connected with.

13           The claims ACTI prevailed on in the

14   underlying state court action are all connected

15   with, originate from, and arise out of Edizon's

16   breach of contract.  That is established by the

17   state court findings, findings of fact, and jury

18   verdict form. And we submit that--those have been

19   provided to the Court as exhibits by ACTI in

20   supplemental pleadings. They're before the Court.

21   They were entered in with respect to the motion for

22   summary judgment.  And on that basis, the Court

23   should grant Essex's motion for summary judgment.

24           THE COURT:  You don't insure contract

25   breaches?

1          MR. JOHNSON:  No, we do not insure

2    contract breaches.  That's right, your Honor, to

3    the point that not only was it in the main policy

4    form, but that was added also in another

5    endorsement just to make sure everybody--all the

6    parties to the contract understood we don't insure

7    contract breaches.

8          MR. BETTILYON:  Your Honor, if I could

9    briefly address the Court.  It seems to me that the

10   cleanest way to do this is, there are new things

11   here that--and the record needs to reflect that.

12   The record needs to reflect that ACTI now owns

13   these claims because they were purchased as part of

14   a settlement agreement.  And that's part of our

15   amended counterclaim.

16          The other thing that needs to be done,

17   your Honor, is that there are really two different

18   issues. There's a duty to defend.  And I'm sure, as

19   the Court knows, your duty to defend is oftentimes

20   triggered even if there is no underlying claim

21   under the policy. And so the law and the facts

22   applied to the duty to defend are different.  And,

23   in fact, nothing that opposing counsel said even

24   remotely bears on that claim, which is completely

25   different, because it's triggered by what the

1      complaint says and what the allegations are.

2              I also want to point out that we didn't

3      prevail--ACTI didn't prevail in the underlying

4      action just on breach of contract claim.  We

5      prevailed on a whole host of different tort-type

6      claims.  And we believe that the advertising injury

7      policy language applies and is applicable to some

8      portion of the judgment because of that.

9              We're not asking for anything that

10     relates to damages or awarded for the breach of the

11     contract. We're asking for compensation that

12     relates to breaches that go to these other tort

13     issues that we think fall within the ambit of their

14     duty to pay damages under their insurance policy.

15             And so for all those reasons, your

16     Honor, I think the most efficient way for the Court

17     to resolve this is simply to schedule time so the

18     parties to file new motions for summary judgment.

19     I'm sure both parties will want to file them.  And

20     let's address these issues with the proper facts,

21     with ACTI now owning the claims, with all of the

22     arguments related to why ACTI can't make these

23     arguments now gone from the record, because we do

24     own the claims, and we can very efficiently and

25     quickly revolve most, if not all, these issues on

1    summary judgment.  And I just think it would be a

2    quick, efficient way for the Court to resolve these

3    issues that have not been resolved by the Court

4    because your prior order did not address the

5    Coverage B issues, which is the only thing we've

6    added, or the only thing we're talking about now in

7    this case.

8              THE COURT:  What specific torts are you

9    talking about?

10             MR. BETTILYON:  The specific torts--

11   Caleb is probably more able to handle that than I

12   am, your Honor.  I'll have him up and we can both

13   address that.

14             MR. FRISCHKNECHT:  As I mentioned

15   earlier, your Honor, there are 15 claims in the

16   underlying complaint.

17             THE COURT:  I only need one good one.

18             MR. FRISCHKNECHT:  And two of which had

19   to do with tortious interference.  One was tortious

20   interference with a contract between ACTI and a

21   company called Sunshine Manufacturing.  And one was

22   a claim for tortious interference with prospective

23   economic relations, dealing with person--other

24   persons in the marketplace with whom--

25             THE COURT:  Are there findings in

1   reference to those two?

2           MR. FRISCHKNECHT:  There are--with

3   respect to the special verdict form, yes, your

4   Honor.  And with respect to the findings of fact

5   and conclusions of law, I believe there are

6   findings there as well.

7           THE COURT:  Did--was there an

8   affirmative finding?

9           MR. BETTILYON:  There were affirmative

10  jury--the jury found in favor of ACTI on those

11  claims.

12          MR. FRISCHKNECHT:  And awarded

13  approximately, between the two of them, $650,000.

14          THE COURT:  What do those torts have to

15  do with advertising?

16          MR. BETTILYON:  Well--and again, maybe

17  Mr. Frischknecht can address this, but generally

18  speaking, your Honor, the argument we have is one

19  of the things that the Edizon was doing in the

20  marketplace is that it was telling people that we

21  were bankrupt, we were going out of business.  And

22  we believe that under the advertising injury policy

23  and under the language of the claims under the

24  language of the insurance contracts, that those

25  types of defamatory statements are covered under

1    the advertising injury theory of liability.  And we

2    also think that because we have raised those as

3    allegations in the underlying complaint, the duty

4    to defend was also triggered separate and apart

5    from the fact that we also obtained a ruling on

6    that.

7              THE COURT:  The language in your

8    underlying complaint, what did it say?

9              MR. BETTILYON:  Let me have Mr.

10   Frischknecht address that.

11             MR. FRISCHKNECHT:  If I may, your Honor,

12   perhaps it would help as well to have the language

13   from the policy.  The language from the policy

14   requires Essex to indemnify for any damages arising

15   out of personal and advertising injury and to

16   provide a defense for suits involving those

17   damages.

18             Personal and advertising injury is

19   defined as follows in the policy:  It means injury,

20   including consequential bodily injury arising out

21   of one or more of the following offenses--and then

22   there are a number of predicate acts here that

23   trigger coverage.  The one that ACTI's tortious

24   interference claims fit into is 14(D), which is

25   oral or written publication in any manner of

1    material that slanders or libels a person or

2    organization or disparages a person's or

3    organization's goods, products, or services.

4            In the second amended complaint, if I

5    may grab my notes, ACTI alleged these tortious

6    interference claims based on a number of underlying

7    facts, including--and perhaps I can provide the

8    Court with some specific paragraphs to look at

9    here--paragraphs 11, 55, 73, 99, and 166 in which

10   ACTI alleges that Edizon made false

11   representations--

12           THE COURT:  Read those to me.

13           MR. FRISCHKNECHT:  Paragraph 11 simply

14   explains that ACTI was an exclusive licensee of

15   various forms of intellectual property.  Paragraph

16   55 states that on August 30th, 2006, Edizon

17   instructed Sunshine Manufacturing, the third party

18   here, to refuse to fill purchase orders.  Sunshine

19   indicated that it would not fill the purchase

20   orders because Edizon, which was not a party to the

21   supply agreement--agreement, instructed Sunshine to

22   breach the supply agreement by not fulfilling

23   ACTI's purchase orders.  And that was based, your

24   Honor, on the underlying statements that were made

25   by--

1          THE COURT:  Read me the statements that

2    you say in your complaint.

3          MR. FRISCHKNECHT:  Paragraph 73:

4    Because of Edizon's continued false representations

5    to others in the industry that the license

6    agreement is terminated, ACTI has been

7    significantly constrained in its attempts to expand

8    and grow its business.  For instance, at least two

9    franchisees have declined to do business with ACTI,

10   resulting in a loss in excess of 1 million in

11   franchise fees alone.

12         THE COURT:  So the franchise is no

13   good?

14         MR. FRISCHKNECHT:  The idea here is that

15   ACTI had franchises--franchisees who were going to

16   sell ACTI's products.  And Edizon was telling these

17   franchisees the license agreement is terminated,

18   which was not true.

19         THE COURT:  Okay.

20         MR. FRISCHKNECHT:  And--and therefore,

21   the implication is, ACTI's products are illegal and

22   if you were selling them, you would be selling

23   illegal products.

24         THE COURT:  Okay.

25         MR. FRISCHKNECHT:  And there are others.

1              THE COURT:  That's an implication to

2      read into it, anyway.

3              MR. BETTILYON:  This is a point of

4      reference--and I apologize, but the reason they

5      claimed the license agreement was terminated was

6      because ACTI was insolvent.  So that was the--

7              THE COURT:  Well, where do you say that

8      in your pleadings?

9              MR. BETTILYON:  I think it was implicit

10     in the pleadings.  And it was certainly implicit--

11             THE COURT:  Well, you don't expressly

12     state it in the pleadings at all.

13             MR. BETTILYON:  Well, if--if it's not in

14     the pleadings, your Honor, it certainly was the

15     central theme at trial, without question.

16             MR. FRISCHKNECHT:  If I may, your Honor,

17     the--our opposing memorandum has also outlined a

18     number of paragraphs that I don't have before me

19     but that talk specifically about the allegations in

20     the complaint that ACTI believes.

21             THE COURT:  But you're saying no

22     franchise, bad franchise.  You say that equals

23     advertising?

24             MR. FRISCHKNECHT:  Advertising, again,

25     your Honor, is a defined term under the policy.

1    Personal and advertising injury means oral or

2    written publications in any manner.

3                THE COURT:  Well, what you're

4    complaining about is, you say no franchise.  That's

5    what you're talking about.

6                MR. FRISCHKNECHT:  Well, the paragraph

7    in the complaint states that Edizon made false

8    representations to the franchisees that the license

9    agreement was terminated.  Let me read that again,

10   your Honor.

11               I apologize.  It's a lengthy complaint.

12               Here in paragraph 73:  Because of

13   Edizon's continued false representations to others

14   in the industry that the license agreement is

15   terminated--so including the franchisees and

16   others--ACTI has been specifically constrained in

17   its attempts to expand and grow its business.  For

18   instance, at least two franchisees have declined to

19   do business with ACTI, resulting in a loss in

20   excess of 1 million in franchise fees alone.

21               So the tortious interference claim was

22   based, at least in part, on Edizon's alleged

23   continued false representations to others in the

24   industry that the license agreement is terminated.

25               THE COURT:  That was an oral statement?

1              MR. FRISCHKNECHT:  Yes, your Honor.

2              THE COURT:  Not a written statement?

3              MR. FRISCHKNECHT:  I do not believe so.

4       But I don't believe the insurance policy requires--

5       it says oral or written publication.

6              THE COURT:  Well, I just wanted to nail

7       it down as to which it was.

8              MR. BETTILYON:  And, your Honor, it is

9       both. There are--there are documents that were

10      produced during the trial that demonstrate that

11      that statement was made both orally and was made in

12      writing to various parties, and similar statements

13      that were false.

14             THE COURT:  When you first say "please

15      defend," you furnish a copy of the document to the

16      carrier and say "please defend."  And so it's the

17      complaint.  It's the complaint on which people make

18      a determination as to whether they will or whether

19      they won't.

20             MR. FRISCHKNECHT:  And--and if I may,

21      your Honor, that duty to defend, if--if--arising

22      from the complaint is not extinguished until there

23      are facts that eliminate the possibility for

24      liability that might be covered by the policy--

25      which is why, your Honor, the various exclusions

1  that have been raised-- for example, the breach of

2  contract exclusion, even if we assume that Judge

3  Skanchy's rulings in the end may possibly have

4  eliminated the duty to indemnify--those rulings

5  were not made until after trial.  They could not

6  have eliminated the duty to defend until those

7  findings were made.

8          A careful reading of the complaint shows

9  that there was a possibility, under the second

10  amended complaint, that ACTI would eventually

11  recover damages on its tortious interference claims

12  that were covered under the policy based on these

13  false representations.

14          THE COURT:  Now, where in Skanchy's

15  rulings does he determine on a item-specific basis

16  anything other than breach?  I mean, this was a

17  jury trial, wasn't it?

18          MR. FRISCHKNECHT:  Yes, your Honor.

19          THE COURT:  Did the jury have the

20  special verdict?

21          MR. FRISCHKNECHT:  Yes, your Honor.

22          THE COURT:  Now, was the--was a

23  question--let's put it that way--interrogatory, a

24  query made of the jury as to the advertising claim?

25          MR. FRISCHKNECHT:  The jury made a

1    finding with respect to the tortious interference

2    claims.

3                THE COURT:  Now--

4                MR. FRISCHKNECHT:  There was no--

5                THE COURT:  How do we equate the

6    tortious interference claim with the advertising

7    claim?

8                MR. FRISCHKNECHT:  In--in the briefing

9    on this issue, particularly the Cincinnati case

10   that was cited in that--in that brief, the

11   insurance case law is fairly clear that pleading

12   labels don't matter with respect to whether or not

13   damages or conduct is covered under the policy.

14   What ultimately matters are the underlying facts.

15                THE COURT:  And ostensibly, the jury is

16   finding facts.  And I'm--my inquiry:  No one ever

17   gave a specific inquiry to the jury as to the

18   advertising claim.  There was a--apparently a

19   general inquiry made in reference to tortious

20   interference.  Was there any division ever made by

21   the jury as to anything other than a--an amount, a

22   single amount?

23                MR. FRISCHKNECHT:  There were several

24   special interrogatories submitted to the jury, but

25   as to any question that would segregate out

1    personal or advertising injury, no.  And ACTI would

2    submit to the Court, your Honor--

3                   THE COURT:  It's all lumped together?

4                   MR. FRISCHKNECHT:  Yes.

5                   And ACTI would submit to the Court, your

6    Honor, that there is good 10th Circuit case law

7    that where an insurer selects not to defend and

8    special interrogatories are not sent to the jury to

9    determine--to separate out covered and noncovered

10   damages, that the burden falls on the insured to

11   prove that the damages awarded by the jury were in

12   fact not covered.  That citation is not in the

13   briefing because that issue didn't come up the

14   first time around. Another reason why, your Honor,

15   we would appreciate an opportunity to brief those

16   summary judgment issues.

17                  In light of that, we do believe, your

18   Honor, that it is possible for this Court to

19   dispose of both the duty to defend and the duty to

20   indemnify on summary judgment.

21                  THE COURT:  Well, ultimately what are

22   you really asking for?

23                  MR. FRISCHKNECHT:  Your Honor, we would

24   like this Court to allow the filing of this amended

25   answer and counterclaim, thereby clarifying the

1  record that ACTI now owns all of the claims with

2  respect to the Essex policies, and then allow the

3  parties to submit cross motions for summary

4  judgment, and at that point decide on a clear

5  record the issues with respect to personal and

6  advertising injury.

7           THE COURT:  Now, you're talking about

8  money, ultimately?

9           MR. FRISCHKNECHT:  Yes, your Honor.

10          THE COURT:  Tell me what money you're

11 talking about.

12          MR. FRISCHKNECHT:  With respect to the

13 duty to defend, your Honor, it's our

14 understanding--and we're still communicating with

15 counsel for Edizon on this issue and finalizing

16 affidavits and declarations to this effect--but

17 currently, ACTI understands that Edizon expended in

18 the range of $800,000 on attorneys' fees to defend

19 the underlying case, and that those fees--

20          THE COURT:  They lost that, didn't they?

21          MR. FRISCHKNECHT:  I'm sorry, your

22 Honor?

23          THE COURT:  Did they win that or lose

24 it?

25          MR. FRISCHKNECHT:  They lost that.  They

1    spent that money in defending the case.  They spent

2    that money to pay their attorneys.

3                THE COURT:  And he lost the case?

4                MR. FRISCHKNECHT:  Yes.

5                THE COURT:  You're asking the insurance

6    company here to pay for losing the case?

7                MR. FRISCHKNECHT:  Yes, your Honor.

8                THE COURT:  And anything else?

9                MR. FRISCHKNECHT:  In addition to that,

10   we believe that the damages awarded by the jury on

11   the tortious interference claims, which amount to

12   approximately $650,000, are indemnifiable under the

13   policy.

14               THE COURT:  Now, why are they

15   indemnifiable?

16               MR. FRISCHKNECHT:  The jury awarded

17   $650,000 and up to the limits of insurance, which I

18   understand to be a million dollars under the

19   policy.

20               THE COURT:  But how do you identify the

21   six-fifty with the tortious interference?

22               MR. FRISCHKNECHT:  On the special

23   verdict form, the jury awarded approximately

24   $304,000 on Claim No. 5, which is tortious

25   interference, with respect to Sunshine

1    Manufacturing; and I believe it's Claim No. 13 for

2    tortious interference with respect to economic

3    relations.  The jury awarded approximately

4    $350,000, the sum total of those being

5    approximately $655,000.

6              THE COURT:  Okay.  You tell me that

7    tortious interference by the insured is covered?

8              MR. FRISCHKNECHT:  Yes, your Honor.  And

9    we've submitted in our brief--and we'll submit, if

10   given the opportunity, several cases from federal

11   district courts and federal circuit courts finding

12   that tortious interference, under the right

13   circumstances, were involving false representations

14   to third parties, are in fact coverable under this

15   very provision.  We're dealing with a CGL policy,

16   which is used broadly across the country.  And ACTI

17   has cited a number of decisions which have in fact

18   held that those damages were indemnifiable under

19   exact policy language used in this case.

20             THE COURT:  For intentional action on

21   the part of the insured?

22             MR. FRISCHKNECHT:  Yes, your Honor.

23             And the distinction there is, insurance

24   policies can cover intentional actions as long as

25   they don't cover actions that--that--where--perhaps

1    the better explanation here would be in the

2    exclusions themselves that have been raised by

3    Essex.

4              For example, the two policy exclusions

5    at issue here--knowing violation of rights of

6    another and material publishing with knowledge of

7    falsity--go to intentional acts.  And this is what

8    the policy says is excluded:  Personal and

9    advertising injury caused by or at the direction of

10   the insured with the knowledge that the act would

11   violate the rights of another and would inflict

12   personal and advertising injury.

13             And with respect to knowledge of

14   falsity--

15             THE COURT:  That's excluded?

16             MR. FRISCHKNECHT:  Yes, your Honor.

17             With respect to knowledge of falsity,

18   personal and advertising injury arising out of oral

19   or written publication of material, if done by, or

20   at the direction of, the insured with knowledge of

21   its falsity.

22             Now, your Honor, with respect to a

23   tortious interference claim, it's highly possible

24   to not know that the statements that you were

25   making were false but still commit tortious

1    interference.

2            And a case that I think might be

3    helpful to the Court on that point that was decided

4    by Judge Campbell, the Ohio Casualty Case.  And the

5    cite on that is 464 Fed.Supp. 2nd 1168.  In that

6    case, it was very similar to this case in that

7    there were tortious interference claims alleged by

8    the third-party claimant against the insured.  And

9    Judge Campbell said in that case the duty to defend

10   is implicated because it's possible to recover for

11   tortious interference without knowing that those

12   false representations were indeed false.  That's

13   what happened here.

14           Your Honor, when this case went to

15   trial, Edizon's defense was "Well, we believed that

16   the contract was actually terminated.  We didn't

17   think that our"--"that our statements were false

18   when we made them."  And it's very possible that

19   the jury could have believed them because, again,

20   tortious--

21           THE COURT:  But it held against them.

22           MR. FRISCHKNECHT:  The jury could have

23   believed that they didn't--that they didn't know

24   that those statements were false and still found

25   them liable for tortious interference.  For

1    tortious interference--a claim for tortious

2    interference is stated where somebody intentionally

3    interferes with a contract with improper means or

4    improper purpose.  And in this case, the improper

5    means were the false statements.

6          Now, the improper means would lower down

7    to a tort of defamation or commercial

8    disparagement. That's what had to be proved in

9    order to reach tortious interference.  And

10   defamation as well as disparagement can be proven

11   simply in the right circumstances by proving

12   negligence or even a recklessness with respect to

13   the truthfulness of the statements.

14         Certainly that's not true if you're

15   dealing with public figures, but none of that was

16   at issue here.  There weren't any First Amendment

17   issues with respect to those statements.  They

18   weren't protected any more than any other

19   statements.

20         ACTI could have and, we believe, did

21   prevail simply by showing that those statements

22   were false, that--and that they were made by Edizon

23   for the purpose of interfering with the contract

24   with the intent to--

25         THE COURT:  They made the statements

1    innocently, they didn't know that they were false?

2         MR. FRISCHKNECHT:  Or it could have been

3    that they made them--they made them negligently.

4    ACTI could have recovered even if the statements

5    were made negligently.  And that's why our tortious

6    interference claims, at minimum--at the outset,

7    when they were alleged, there is no allegation in

8    the complaint that the false representations

9    alleged in paragraph 73 were made with knowledge

10   that they were false.  That's the distinction.  And

11   that's why the duty to defend was triggered here.

12         Edizon--at the time the complaint was

13   filed, it was very possible that ACTI would

14   eventually recover damages on those tortious

15   interference claims, even though Edizon didn't know

16   the statements were false, as long as ACTI proved

17   that the statements were false, that they were made

18   recklessly or negligently, and then satisfied the

19   other elements of the tortious interference claim,

20   which is why these other courts, the cases that

21   we've cited to the Court in our brief, have upheld

22   awards to third parties or insureds based on this

23   very provision for personal and advertising injury

24   coverage on tortious interference claims.

25         THE COURT:  Okay.

1          MR. FRISCHKNECHT:  Thank you, your

2     Honor.

3          MR. JOHNSON:  The two tort claims that

4     ACTI hangs their hats on--one is tortious

5     interference with contractual relations, which in

6     Judge Skanchy's findings of fact, conclusions of

7     law, and order talks about as being internally

8     related or essentially the flip side of a--he says:

9     In addition, the jury's finding concerning Edizon's

10    interference with ACTI's rights in the supply

11    agreement necessarily occurred during the summer of

12    2006.  The jury's findings that Edizon tortiously

13    interfered with ACTI's contractual relationship

14    with Edizon's sister company, Sunshine, have a

15    bearing on another finding of the jury.  The jury

16    found that Edizon breached the covenant of good

17    faith and fair dealing.

18          And if you read through Judge Skanchy's

19    findings, you'll see he ties the tortious

20    interference with contract claim which arose out of

21    some statements made to the breach of the implied

22    covenant of good faith and fair dealing that they

23    had in the supply agreement.

24          So with respect to the tortious

25    interference with contractual relations claim, that

1    arises out of the breach of contract, the breach of

2    the supply agreement.  And we rely on Judge

3    Skanchy, who sat there, who heard the testimony

4    come in, and his findings of fact and his

5    conclusions of law with respect to those two causes

6    of action as being internally related as supporting

7    the argument that the tortious interference with

8    contractual claims arises out of, originates from--

9    however you want to put it-- has a nexus with the

10   breach of the supply agreement.

11           With respect to their argument that the

12   tortious interference claim--tortious interference

13   with respect to economic advantage all by itself

14   supports a claim for coverage--first, the cases--

15   and I think I actually discussed this in--in one of

16   the pleadings--the cases that were cited by ACTI in

17   their original pleadings on this matter were all

18   cases that addressed the duty to defend.

19           Your Honor, it is true that as a matter

20   of common law, the duty to defend is broader than

21   the duty to indemnify.  And that's--that's a judge-

22   made rule.  Just like the made whole doctrine,

23   which says if an injured party isn't made whole,

24   then the insurance company, as their insurer, can't

25   step in their shoes and subrogate against somebody

1   until they're made whole.  Until they're completely

2   repaired and fixed up, you can't take any money

3   from some tort-feasor out there, insurance company.

4   You got to make sure your insured is made whole.

5   That's a judge-made rule.

6              However, Utah Supreme Court has made

7   clear that if the insurance contract itself

8   addresses such issues, then the judge-made rules

9   give way to the terms of the contract, to the

10  agreement of the parties.  And in fact, Utah

11  Supreme Court has ruled that the made whole

12  doctrine doesn't apply if the insurance contract

13  says the insurer gets dollar one first.  Then the

14  made whole doctrine gets put to the side because

15  the parties have spoken in terms of the contract.

16             In our complaint for declaratory relief,

17  your Honor, we cite to a provision in the

18  endorsement, the combined general endorsement

19  that's attached to this policy, that says

20  specifically if there is no coverage, there is no

21  duty to defend.  So for purposes of this case

22  before the Court, the parties have agreed in the

23  contract that the duty to defend is not broader

24  than the duty to indemnify.  And if there is no

25  duty to indemnify, there is no duty to defend.

1          And I would urge the Court to review

2     the findings of fact, conclusions of law, and order

3     issued by Judge Skanchy.  I would urge the Court to

4     read the special jury verdict form and review the

5     findings of the jury.  And I think the Court's

6     skepticism about coverage will be confirmed, that

7     the findings are such that the tortious

8     interference with prospective economic relations

9     claim will fall due to the exact exclusions that

10    have been cited by ACTI's counsel here and

11    discussed with the Court that are in the body of

12    the policy, as well as the other exclusionary

13    provisions that are in what's called the combined

14    endorsement that was added to this 2006-07 policy

15    which is at issue in this case.

16          THE COURT:  Counsel initially filed a

17    motion asking for clarification.  In your view,

18    what clarification needs to be made?

19          MR. JOHNSON:  I think the Court needs

20    to make an affirmative finding that the findings of

21    the jury and the trial court in the underlying

22    action are such as to invoke numerous exclusions,

23    invoke--that are directly applicable to the only

24    two claims that I think are in dispute:  tortious

25    interference with contract, tortious interference

1    with respect to economic advantage.

2         Further--

3         THE COURT:  Counsel argues that the

4    exclusion is of such a nature as to require an

5    intentional interference and he suggests that one

6    could find interference without the existence of

7    intentional interference.

8         MR. JOHNSON:  I know that, your Honor.

9    It brought to mind something I remember reading in

10   Judge Skanchy's findings of fact, where he actually

11   starts talking about some of the testimony of some

12   of the Edizon principals.  And Edizon was making

13   some arguments that they hadn't really breached any

14   contract so they hadn't done anything bad, and that

15   the jury--that's what the jury hadn't found that

16   they'd done anything bad.

17        And Judge Skanchy says during the trial,

18   Mr. Tony Pearce, who was a principal of Edizon,

19   acknowledged that the notices of incurable breach

20   letters that were sent to ACTI on January 21st,

21   2006, violated paragraph 22 of the settlement

22   agreement. There was testimony elicited at trial

23   that they were intentionally doing things they knew

24   were in breach of--of their--of the settlement

25   agreement they'd entered into with ACTI over their

1    first round of disputes.

2              I don't know what testimony counsel is

3    alluding to, because the testimony that's in the

4    record before this Court is recitations of

5    intentional conduct by Edizon in wrongdoing.

6              I--I think the Court needs to go off

7    the information that it has, that's provided to it,

8    that's in the record about what was--what Edizon--

9    what testimony came in about Edizon's conduct at

10   trial.

11             THE COURT:  Tell me what you want

12   clarified.

13             MR. FRISCHKNECHT:  Your Honor, the

14   motion for clarification was filed simply because

15   ACTI's understanding of the March 2009 ruling was

16   that it didn't rule on the issues of whether or not

17   Essex had a duty to defend with respect to Coverage

18   B, personal and advertising injury, and whether

19   Essex had a duty to indemnify with respect to

20   personal and advertising injury.

21             THE COURT:  Why don't you read to me

22   the abbreviated order that was sent out.

23             MR. FRISCHKNECHT:  Well, I apologize,

24   your Honor.  It was not included in my hearing

25   binder.  I do have a few quotes, but it wouldn't

1   be complete. It's from our brief.

2          My understanding of that ruling is that

3   the Court ruled that there was no occurrence within

4   the meaning of the Essex policy and that there

5   wasn't any property damage as defined by the

6   policy, and therefore, that there was no useful

7   purpose in dealing with the remaining issues.

8          And ACTI's concern with respect to that

9   ruling, your Honor, is that the term "occurrence"

10  has no relevance to Coverage B.  The term

11  "occurrence" isn't used in personal and advertising

12  injury.  And whether or not there was an occurrence

13  with respect to Coverage A for bodily injury or

14  property damage doesn't bear on whether there's

15  coverage for personal and advertising injury under

16  Coverage B.

17         Your Honor, if I may address a few of

18  the points raised by Mr. Johnson.  Your Honor,

19  you're hearing a lot of things today for the first

20  time, which, again, is one more reason to allow the

21  parties to submit a clean record on which this

22  Court can decide the issues finally and

23  dispositively.

24         I would mention that a full reading of

25  Judge Skanchy's ruling would indicate that some of

1   those statements were somewhat taken out of context

2   and are likely not applicable to what we're arguing

3   here.

4             I would also remind the Court that this

5   was a jury trial and that the findings of fact and

6   conclusions of law issued by Judge Skanchy had to

7   do with respect to a claim for declaratory judgment

8   that was not tried to the jury.  Those findings of

9   fact and conclusions of law are not binding on this

10  Court with respect to these issues.

11            And finally, I would say, and most

12  importantly, your Honor, those findings of fact and

13  conclusions of law were issued long after the trial

14  in that case.  They have no bearing on whether or

15  not--

16            THE COURT:  That took a long time to

17  get there, I--

18            MR. FRISCHKNECHT:  Yes, your Honor,

19  years.

20            THE COURT:  I noticed that.

21            MR. FRISCHKNECHT:  Which explains the

22  $800,000 in--approximately, in attorneys' fees.

23            Now, those findings of fact and

24  conclusions of law, again, your Honor, have no

25  bearing on the duty to defend, which determination

1   was made at the time the complaint was filed and

2   submitted to the insured.

3             THE COURT:  Well, that really has to do

4   with the nature of the complaint.

5             MR. FRISCHKNECHT:  Yes, your Honor.

6             And Utah case law--in particular, a case

7   cited in our brief, Benjamin vs. Amica Mutual,

8   decided by the Utah Supreme Court in 2006,

9   indicates that with respect to the duty to defend,

10  what really matters is the language of the

11  complaint and that the insurer has a duty to defend

12  until facts and circumstances arise showing that

13  under no circumstance will the insured be held

14  liable in that case for damages that are covered

15  under the policy.

16            To the extent Mr. Johnson and Essex

17  assert that that happened after the trial, even if

18  that is the case, which we don't agree with, for

19  reasons that we've stated before, it certainly

20  didn't eliminate the duty to defend while Edizon

21  was racking up hundreds of thousands of dollars in

22  fees.

23            For all these reasons, your Honor, we

24  think it would be in the interest of justice and

25  the interest of efficiency to allow the complaint

1    to be amended and these issues to be carefully

2    briefed before the Court and decided once and for

3    all.

4              THE COURT:  Thanks a lot.  I'll reserve

5    on your motion, go from there.  Thanks a lot.

6    Appreciate your help.

7              MR. JOHNSON:  Thank you, your Honor.

8              THE COURT:  We'll be in recess till

9    9:30 tomorrow.

10        (Proceedings concluded at 2:28 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25